IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: |
| v. | : | DATE FILED: |
| ARI TIETOLMAN | : | VIOLATIONS:<br>18 U.S.C. §§ 1343, 1349 (wire fraud – 3 counts)<br>18 U.S.C. § 1956(a)(2) (money laundering – 4 counts)<br>Notice of forfeiture |
| | : | |
| | : | |

## INDICTMENT

## COUNTS ONE THROUGH THREE

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

### Background

1. Defendant ARI TIETOLMAN was a Canadian citizen living in Quebec, Canada.

2. C.B., known to the Grand Jury, was a United States citizen living in New York and Arizona.

3. R.B., known to the Grand Jury, was a Canadian citizen living in Florida.

4. L.F., known to the Grand Jury, was a United States citizen living in Florida and Chester County, Pennsylvania.

5. M.F., known to the Grand Jury, was a United States citizen living in Chester County, Pennsylvania.

6. B.S., known to the Grand Jury, was a United States citizen living in Florida.

7. Standard American Marketing, Inc. ("Standard American Marketing") was a Delaware corporation with its principal place of business listed as Phoenix, Arizona.

8. Secure Account Services, LLC ("Secure Account Services") was a Florida limited liability company with its principal place of business listed as Tampa, Florida and Downingtown, Pennsylvania.

9. First Consumers, LLC ("First Consumers") was a Pennsylvania limited liability company with its principal place of business listed as Downingtown, Pennsylvania. First Consumers also did business as Fraud Watch, Patient Assistance Plus, and Legal Eye.

10. PowerPlay Industries, LLC ("PowerPlay") was a Florida limited liability company with its principal place of business listed as Coconut Creek, Florida and Downingtown, Pennsylvania.

11. TrustOne was an Arizona corporation with its principal placed of business listed as Phoenix, Arizona and Downingtown, Pennsylvania.

12. Madicom Inc. ("Madicom") was a Canadian corporation owned by defendant ARI TIETOLMAN.

13. Landshark Holdings, Inc. ("Landshark") was a Canadian corporation owned by defendant ARI TIETOLMAN.

## THE SCHEME

14. From in or about 2005 to in or about March 2014, defendant

**ARI TIETOLMAN,**

and others known and unknown to the Grand Jury, devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

## MANNER AND MEANS

It was part of the scheme that:

15. Defendant ARI TIETOLMAN used a network of telemarketers to target American seniors with deceptive telemarketing calls, selling worthless or non-existent services, and then had his organization debit seniors' bank accounts without their informed consent.

### The Fraud Companies

16. Defendant ARI TIETOLMAN created, or had the following companies (collectively "the fraud companies"), created:

    a. Standard American Marketing, that also did business as Secure Account Services, and sold a purported fraud protection service;

    b. First Consumers, that also did business as Fraud Watch, Patient Assistance Plus, and Legal Eye, and sold a purported fraud protection service, discount prescription medicine card, and discounted legal service;

    c. TrustOne, that sold a purported discount prescription medicine card.

17. The products offered by the fraud companies were worthless or non-existent. For example:

    a. The victims who were convinced to buy the fraud protection service from Fraud Watch, received no service.

    b. The victims who were convinced to buy the discount prescription product from Patient Assistance Plus or TrustOne received a prescription drug discount card along with a list of participating pharmacies that purportedly accepted the cards. However, these cards are available to consumers, free of charge, on public websites, and these cards typically

provided no discount benefits to people insured by Medicare or private insurance companies. The overwhelming majority of the victims of this scheme were senior citizens and thus insured by Medicare.

        c.     The victims who were convinced to buy the legal services product from Legal Eye received no service.

### The Telemarketing Scheme

        18.     Defendant ARI TIETOLMAN obtained names and telephone numbers of elderly Americans.

        19.     Defendant ARI TIETOLMAN hired telemarketers in and around Montreal, Canada, to call these elderly Americans to sell the products offered by these companies.

        20.     During these calls, defendant ARI TIETOLMAN's telemarketers made various false representations, such as they were calling on behalf of, or are affiliated with, the victim's bank, or insurance company, or the United States government.

        21.     During these calls, defendant ARI TIETOLMAN's telemarketers described the products marketed by the fraud companies, and often misled the consumers about the need for these products and services. For example:

        a.     When selling the product offered by Fraud Watch, the telemarketers often claimed that consumers must sign up, or renew, their fraud protection service immediately to preserve their protection against the threat of bank fraud. However, the fraud companies offered no real fraud protection and Fraud Watch did nothing to help prevent fraud.

        b.     When selling the product offered by Patient Assistance Plus or TrustOne, the telemarketers often claimed that this service provided consumers substantial

discounts on prescription medicine and that Patient Assistance Plus or TrustOne "worked directly" with the drug manufacturers. However, Patient Assistance Plus and TrustOne had no relationship with drug companies and the benefits it claimed to sell were worthless.

22. In addition to misrepresenting the value of the products being marketed, defendant ARI TIETOLMAN's telemarketers also misrepresented the cost of these products, sometimes telling consumers the products were free, or less expensive than the amount that was ultimately debited from the consumers' bank accounts.

23. In other instances, defendant ARI TIETOLMAN's telemarketers assured consumers they would not debit the consumers' bank accounts and then did just that after the consumer provided their bank account information.

**Tietolman Attempted to Conceal His Involvement in the Fraud**

24. Defendant ARI TIETOLMAN attempted to conceal his involvement in the scheme by employing M.F., L.F., C.B., B.S., and R.B., to run "front" companies and process the fraud money.

25. Defendant ARI TIETOLMAN paid M.F., L.F., C.B., B.S., and R.B. to form corporations in the United States. The sole purpose of these corporations was to process the fraud proceeds generated by the telemarketing scheme. Defendant ARI TIETOLMAN then instructed M.F., L.F., C.B., B.S., and R.B. to open up numerous bank accounts in the names of the fraud companies that they had incorporated.

26. Defendant ARI TIETOLMAN sent, or had others send, M.F., L.F., C.B., B.S., and R.B., bank account information for the victims in the United States. Using computer programs and printers provided by defendant ARI TIETOLMAN, M.F., L.F., C.B., B.S., and R.B., used the victims' bank account information to print remotely created checks ("RCCs"), in

the United States, in amounts ranging from $18 to $400. The RCCs were all made payable to the fraud companies and did not require a signature by the account holder. Because these RCCs did not require the account holder's consent each time a check was created and submitted to the bank for payment, the account holder-victim had no opportunity to object or prevent the debit from occurring.

27. M.F., L.F., C.B., B.S., and R.B. deposited the RCCs in bank accounts held by the fraud companies.

28. Defendant ARI TIETOLMAN instructed M.F., L.F., C.B., B.S., and R.B. to deposit the RCCs in batches of less than $10,000 to avoid federally-mandated reporting requirements. After the checks were deposited, defendant ARI TIETOLMAN instructed M.F., L.F., C.B., B.S., and R.B. to wire the majority of the funds to accounts in Canada held by TIETOLMAN, Madicom, and Landshark.

**Tietolman Used American Banks to Perpetuate the Scheme**

29. Defendant ARI TIETOLMAN knew that many victims would notice the unauthorized debits from their account and complain to their banks. In such cases the victim's bank would then reverse the debit and return the RCC to defendant M.F., L.F., C.B., B.S., or R.B., and designate the returned check as "UNAUTHORIZED," or something similar. Indeed, from 2011 on, there were more than $8 million in returned RCCs.

30. Defendant ARI TIETOLMAN knew that many banks were suspicious of businesses like the fraud companies that used RCCs and generated a large number of return checks. In addition, defendant ARI TIETOLMAN knew that many banks would close accounts of such businesses because of concerns they were engaged in fraudulent or criminal activity.

31. To ensure that his telemarketing scheme had banks in which to deposit the

RCCs, defendant ARI TIETOLMAN instructed M.F., L.F., C.B., B.S., and R.B. to open bank accounts for the fraud companies at numerous banks simultaneously. Accordingly, the fraud companies still had accounts to deposit the fraud proceeds even if one or more banks froze and/or closed their accounts.

### Tietolman Took Steps to Avoid Law Enforcement

32. In or about June 2009, the state of Kansas sued L.F. and Secure Account Services, alleging that L.F. and Secure Account Services had engaged in telemarketing fraud, using tactics similar to the allegations in this indictment.

33. In or about September 2009, defendant ARI TIETOLMAN's attorney negotiated a settlement on behalf of L.F. and Secure Account Services with the State of Kansas, whereby they agreed to pay a fine and refrain from engaging in deceptive telemarketing in the State of Kansas.

34. Following the Kansas lawsuit, defendant ARI TIETOLMAN instructed his telemarketers not to call people in Kansas and other states where law enforcement had pursued litigation against him, M.F., L.F., C.B., B.S., and R.B., or the fraud companies.

### Scope of the Fraud

35. While defendant ARI TIETOLMAN has used this scheme since at least 2005, since May 2011, he has used this scheme to take more than $13 million from tens of thousands of senior Americans.

36. On or about the dates specified below, in the Eastern District of Pennsylvania, and elsewhere, defendant

### ARI TIETOLMAN,

for the purpose of executing the scheme described above, and attempting to do so, and aiding and

abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, each transmission constituting a separate count of this indictment:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| One | November 28, 2012 | A $9,000 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Madicom's bank account at Jameson Bank in Canada. |
| Two | January 4, 2013 | A $7,522.69 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Madicom's bank account at Jameson Bank in Canada. |
| Three | April 17, 2013 | A $9,950 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2, and Title 18, United States Code, Section 2326.

## COUNTS FOUR THROUGH SEVEN

THE GRAND JURY FURTHER CHARGES THAT:

1. Paragraphs one through thirteen and fifteen through thirty-five of Count One are incorporated here.

2. Defendant ARI TIETOLMAN paid M.F. to open bank accounts in Pennsylvania in the name of the fraud companies to deposit fraud proceeds from the telemarketing scheme described in Count One.

3. Defendant ARI TIETOLMAN instructed M.F. to deposit the fraud proceeds in the fraud companies' bank accounts in amounts less than $10,000 to avoid federally-mandated reporting requirements.

4. Defendant ARI TIETOLMAN instructed M.F. to wire the fraud proceeds from the fraud companies' bank accounts in the United States to bank accounts he controlled in Canada, in amounts less than $10,000 to avoid federally-mandated reporting requirements.

5. Between January 2011 and March 2014, M.F. sent, by electronic wire or check, approximately $4.3 million from the First Consumers' account at Susquehanna Bank to bank accounts controlled by defendant ARI TIETOLMAN in Canada.

6. On or about the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

### ARI TIETOLMAN

knowingly conducted, and attempted to conduct, and aided, abetted, and willfully caused, the following financial transactions affecting interstate commerce:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Four | May 1, 2013 | A $9,800 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |
| Five | May 2, 2013 | A $9,897.57 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |
| Six | June 18, 2013 | A $9,865.45 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |
| Seven | June 19, 2013 | A $9,704.22 bank wire from First Consumers' bank account ending in 1394 at Susquehanna Bank in the Eastern District of Pennsylvania to Landshark's bank account in Canada. |

7. When conducting, aiding, abetting, and willfully causing, the financial transactions described in paragraph 6 above, defendant ARI TIETOLMAN knew that the property involved in those financial transactions represented the proceeds of some form of unlawful activity.

8. The financial transactions described in paragraph 6 above involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343, and defendant ARI TIETOLMAN acted with the knowledge that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity.

9. The financial transactions described in paragraph 6 above involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of 18 U.S.C. § 1343, and defendant ARI TIETOLMAN acted with the knowledge that the transactions were designed, in whole and in part to avoid a transaction reporting requirement under state or federal law.

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i), (B)(ii) and 2.

## NOTICE OF FORFEITURE

THE GRAND JURY FURTHER CHARGES THAT:

1. As a result of the violations of Title 18, United States Code, Sections 1343 and 1956, set forth in this indictment, defendant

**ARI TIETOLMAN**

shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL:

_____
GRAND JURY FOREPERSON

_____
ZANE DAVID MEMEGER
UNITED STATES ATTORNEY